Lawrence S. Lustberg, Esq.
Jessica L. Hunter, Esq.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
llustberg@gibbonslaw.com
jhunter@gibbonslaw.com

Katherine Rosenfeld, Esq.*
Andrew K. Jondahl, Esq.*
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
krosenfeld@ecbalaw.com
ajondahl@ecbalaw.com

*Motion for pro hac vice admission
forthcoming*

*Attorneys for Plaintiff Jane Doe*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANE DOE, a pseudonym,<br><br>Plaintiff,<br><br>v.<br><br>MIDDLESEX COUNTY, NEW JERSEY; WARDEN OF THE MIDDLESEX COUNTY JAIL MARK J. CRANSTON; SHERIFF OF MIDDLESEX COUNTY MILDRED SCOTT; MIDDLESEX COUNTY DEPARTMENT OF CORRECTIONS ("MCDOC") OFFICER JESSIE A. JIMENEZ; MCDOC SERGEANT TABITHA A. KNIGHT; MCDOC OFFICER DANIEL J. MARCINKO; MIDDLESEX COUNTY SHERIFF'S OFFICE ("MCSO") INVESTIGATOR MAUREEN A. BOCKNACK; MCSO OFFICER DAWN R. BURCH; MCSO OFFICER MYESHA CARABALLO; MCSO OFFICER JEFFREY DOMINGUEZ; MCSO LIEUTENANT RANDY P. EINHORN; MCSO INVESTIGATOR SHARI EISENBERG; MCSO OFFICER JOSEPH F. JOHNSON; MCSO OFFICER MARGARET KOLTA; MCSO OFFICER ASHLEY KOPHAMEL; MCSO OFFICER JOSHUA PADILLA; MCSO OFFICER IVERINISSE RIVERA; MCSO SERGEANT EDWIN R. MATA; | No. 20-cv-8625<br><br><br>**COMPLAINT<br>AND DEMAND<br>FOR JURY TRIAL** |

MCSO LIEUTENANT CHRISTOPHER E.
NEDER; MSCO OFFICER JOHN JOE #1-2; AND
MCSO OFFICER JANE JOE #1,

                    Defendants.

Plaintiff Jane Doe, by and through her attorneys, Gibbons P.C. and Emery Celli Brinckerhoff & Abady LLP, for her Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.      This case is about Middlesex County's inhumane and dangerous conduct of shackling a pregnant prisoner, Plaintiff Jane Doe[1]—using handcuffs and shackles on her hands and feet—(1) while she was transported from the Middlesex County Jail to the hospital at nine months pregnant; (2) while she was in active labor; (3) while she prepared to undergo an emergency caesarean section; and (4) while she was recuperating in the hospital after she gave birth to her son.   It is also about the County's cruel and arbitrary decision to deny Ms. Doe the ability to contact her partner when she went into labor so that he could attend the birth of their child, and forcing her to labor and deliver her baby alone, although she posed no security risk at any time to anyone.  Shackling pregnant women is an unnecessary and barbaric practice, and poses a serious threat to the health of the mother and child: it has no legitimate place in civilized society or in Middlesex County's care and custody of people such as Jane Doe.

2.      Plaintiff Jane Doe was incarcerated in the Middlesex County Jail on a non-violent offense in February 2018.  After entering the jail when she was four months pregnant, Ms. Doe spent the duration of her pregnancy there, without incident.  When Ms. Doe went into labor on July 11, 2018, however, Defendants endangered the health of Ms. Doe and her son, and placed

---

[1] Plaintiff's Motion to Proceed Pseudonymously is forthcoming.

Ms. Doe at significant risk of injury, by shackling her in the jail medical clinic, during her transport to the hospital in an ambulance, throughout her labor at St. Peter's Hospital, during the three days she remained hospitalized post-partum, during her return transport to the jail, and during subsequent transports during the post-partum recovery period. Despite Ms. Doe's repeated requests to the medical staff, Defendants refused to remove the restraints from Ms. Doe, compelling Ms. Doe to labor in pain and recuperate from major surgery while chained to a bed. Defendants also denied Ms. Doe the right to contact her partner, the baby's father, so that he could come to the hospital and support her during what turned out to be a grueling labor and emergency cesarean section, which she instead endured alone.  The results of Defendants' actions were substantial risks to the health and safety of Ms. Doe and her child, as well as physical injury and emotional distress during and after the birth of her son, her first and only child.

3.      While she was in Defendants' custody, Jane Doe never struggled, resisted, or acted in any way that would even remotely support the use of restraints.  Ms. Doe was terrified for herself and for her baby.  She desperately wanted her partner to be present for the birth of her son, at her chosen hospital.  For months after she left the hospital, and even today, Ms. Doe has felt anguished and disturbed as she remembered the horrific circumstances she was forced to endure to deliver her son.

4.      This is a civil rights case about the egregious failure of the Defendants to protect the health, safety, and dignity of a woman at one of the most important and vulnerable moments in her life, as well as their unjustified interference with her right to family relationships. Defendants participated in, approved of, or failed to prevent the shackling of Ms. Doe and her separation from her fiancé during the birth of their child—even as she labored, immediately after

she gave birth, and while she cared for her new baby with one arm or one leg handcuffed to her hospital bed.

5.      Plaintiff Jane Doe brings this action seeking damages pursuant to 42 U.S.C. § 1983 against Middlesex County, correction officers at the Middlesex County Jail and their supervisors in the Middlesex County Department of Corrections, and sheriff's officers and their supervisors at the Middlesex County Sheriff's Office, for the deprivation of her rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution and under New Jersey state law.  She also brings this action pursuant to the New Jersey Constitution and the New Jersey Civil Rights Act for violations of the rights secured to her by Article I, Paragraphs 1, 7, and 12 of the state constitution.

## **THE PARTIES**

6.      Plaintiff Jane Doe is a citizen of the United States and at all relevant times was a resident of New Jersey.

7.      Defendant Middlesex County, New Jersey ("the County") is a political entity organized and existing under the laws of the State of New Jersey. At all relevant times, the County, acting through the Middlesex County Sheriff's Office ("MCSO") and the Middlesex County Office of Adult Correction & Youth Services, also known as the Middlesex County Department of Corrections ("MCDOC"), which operates the Middlesex County Adult Correction Center ("jail" or "Middlesex County Jail"), was responsible for the policy, practice, supervision, implementation, and conduct of all MCDOC and MCSO matters, including the appointment, training, supervision, and conduct of all Middlesex County Jail and MCSO personnel.  In addition, at all relevant times, the County was responsible for enforcing the rules of the MCDOC and Middlesex County Jail and

ensuring that the personnel or both offices obeyed the laws of the United States and of the State of New Jersey.

8.      Defendant Mark J. Cranston is the Warden of the Middlesex County Jail and held that position at all times relevant to this Complaint.  Upon information and belief, Defendant Cranston is responsible for the overall oversight, operation, and administration of the jail including the creation and enforcement of policies and procedures and the care and custody of all individuals incarcerated there.  At all relevant times, Defendant Cranston was acting in the scope of his employment, under color of state law, and in his individual and official capacities.

9.      Defendant Mildred Scott is the Sheriff of Middlesex County and held that position at all times relevant to this Complaint.  Upon information and belief, Defendant Scott is responsible for the overall oversight, operation, and administration of the MCSO, including the creation and enforcement of policies and procedures and the transport, care and custody of all individuals incarcerated at the Middlesex County Jail when those individuals are moved outside of the jail, such as for court appearances or hospital stays.  At all relevant times, Defendant Scott was acting within the scope of her employment and under color of state law, and in her individual and official capacities.

10.     Defendant Correction Officer Jessie A. Jimenez was an MCDOC employee and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

11.     Defendant Correction Sergeant Tabitha A. Knight was an MCDOC employee and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

12.     Defendant Correction Officer Daniel J. Marcinko was an MCDOC employee and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

13.     Defendant Sheriff's Investigator Maureen A. Bocknack was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

14.     Defendant Sheriff's Officer Dawn R. Burch was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

15.     Defendant Sheriff's Officer Myesha Caraballo was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

16.     Defendant Sheriff's Officer Jeffrey Dominguez was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

17.     Defendant Sheriff's Officer Lieutenant Randy P. Einhorn was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

18.     Defendant Sheriff's Investigator Shari Eisenberg was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

19.    Defendant Sheriff's Officer Joseph F. Johnson was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

20.    Defendant Sheriff's Officer Margaret Kolta was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

21.    Defendant Sheriff's Officer Ashley Kophamel was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

22.    Defendant Sheriff's Officer Sergeant Edwin R. Mata was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

23.    Defendant Sheriff's Officer Lieutenant Christopher E. Neder was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

24.    Defendant Sheriff's Officer Joshua Padilla was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

25.    Defendant Sheriff's Officer Iverinisse Rivera was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to this complaint.

26.    Defendant Sheriff's Officer John Joe #1 was an employee of the MCSO and was acting within the scope of said employment and under color of state law at all times relevant to

this complaint.  Upon information and belief, Defendant John Joe #1 is the partner of Defendant Kophamel.

27.    Defendant Sheriff's Officers John Joe #2 and Jane Joe #1 were an employees of the MCSO and were acting within the scope of their employment and under color of state law at all times relevant to this Complaint.

28.    Defendants Jimenez, Knight, Marcinko, Bocknack, Burch, Caraballo, Dominguez, Einhorn, Eisenberg, Johnson, Kolta, Kophamel, Mata, Neder, Padilla, Rivera, Sheriff's Officer John Joe #1-2, and Sheriff's Officer Jane Joe #1 are collectively referred to herein as "the Individual Officer Defendants."  At all relevant times, all the Individual Officer Defendants were acting in their individual capacities.

## JURISDICTION AND VENUE

29.    This action arises under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New Jersey state law, including the New Jersey Constitution and N.J.S.A. 10:6-2.

30.    The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

31.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in Middlesex County, New Jersey, within the United States District Court for the District of New Jersey.

## FACTUAL ALLEGATIONS

**A.      Plaintiff is Restrained while Pregnant After Being Remanded to the Middlesex County Jail.**

32.      Plaintiff Jane Doe ("Plaintiff" or "Ms. Doe") is a 30-year-old woman.  She lives in Middlesex County with her fiancé, "Richard Roe," and their young son, "Baby Doe."[2]

33.      In late 2017, Plaintiff became pregnant with Baby Doe, whose estimated delivery date was July 7, 2018.  She began receiving regular prenatal care and looked forward to delivering her baby at St. Peter's University Hospital in New Brunswick, New Jersey.

34.      Prior to becoming pregnant, Ms. Doe had been sentenced to a probationary term and participation in the New Jersey Superior Court Drug Court Program in the Middlesex Vicinage.  She was still participating in that program at the time she learned of her pregnancy with Baby Doe.

35.      On February 6, 2018, the judge overseeing Ms. Doe's case in the Drug Court Program remanded her to the custody of the MCDOC for a probation violation following a substance abuse relapse. Ms. Doe was to be held at the Middlesex County Jail until she could be placed in a drug treatment program for pregnant women.

36.      Ms. Doe was formally booked into the jail in the early hours of February 7, 2018. Ms. Doe immediately alerted staff at Middlesex County Jail that she was approximately four months pregnant, and her pregnancy was confirmed the same day by a pregnancy test administered by medical staff at the jail.

---

[2] "Richard Roe" and "Baby Doe" are pseudonyms, used to protect the identity of Ms. Doe, who as noted above, intends to file a motion to prosecute this matter under a pseudonym.  Richard Roe was Ms. Doe's boyfriend at the time of the events detailed in this Complaint; the couple has since become engaged.  For the sake of clarity, Richard Roe is referred to as Ms. Doe's fiancé throughout the Complaint.

37.     Between February 7, 2018 and May 11, 2018, MCSO and/or MCDOC personnel transported Ms. Doe from the Middlesex County Jail to off-site prenatal care visits on multiple occasions.  Each time, the MCSO and/or MCAAC staff transporting her unnecessarily restrained Ms. Doe by placing her in handcuffs, despite being well aware she was pregnant.

38.     Between February 7, 2018 and May 11, 2018, MCSO personnel transported Ms. Doe from the Middlesex County Jail to off-site court appearances on multiple occasions.  Each time, the MCSO staff transporting her unnecessarily restrained Ms. Doe by placing her in handcuffs, despite being well aware she was pregnant.

39.     During these trips to medical appointments and court appearances between February 7, 2018 and May 11, 2018, Ms. Doe never struggled, resisted, or acted in any way that would cause MCSO and/or MCDOC staff to believe that she was a risk of harm to herself or to others, or that she was a flight risk.

40.     At the order of the judge presiding over her drug court case, Ms. Doe was released from the Middlesex County Jail on May 11, 2018 to an inpatient drug treatment and individual counseling program at Integrity House in Newark, New Jersey.  She was subsequently remanded to the Middlesex County Jail on May 24, 2018 for a violation of program rules.

41.     Between May 24, 2018 and July 10, 2018, MCSO and/or MCDOC personnel transported Ms. Doe from Middlesex County Jail to off-site prenatal care visits on multiple occasions.  Each time, the MCSO and/or MCDOC staff transporting her unnecessarily restrained Ms. Doe by placing her in handcuffs, despite being well aware she was pregnant.

42.     During one such transport close to Ms. Doe's due date, the weather was particularly hot.  Ms. Doe was overheating in the stifling backseat of a patrol car, separated from the cooling vents in the front of the vehicle by a plastic barrier, and with her hands cuffed in front of her

pregnant belly.  Concerned for the safety of herself and her unborn baby, Ms. Doe asked Defendant Kophamel and her partner, Defendant John Joe #1, to roll down the window. The sheriff's officers at first refused.  Eventually, after Ms. Doe repeatedly begged them, Defendant Kophamel rolled down the window one quarter inch at a time, never opening it more than two or three inches.

43.     On another occasion, this time on July 1, 2018 at approximately 8:00 a.m., six days before Ms. Doe's due date, MCDOC corrections officers and emergency medical services personnel transported Ms. Doe to Robert Wood Johnson University Hospital via ambulance to "rule out" labor due to leakage of amniotic fluid.  MCDOC corrections officers handcuffed Ms. Doe during transport.

44.     Between May 24, 2018 and July 10, 2018, MCSO personnel transported Ms. Doe from Middlesex County Jail to off-site court appearances on at least one occasion.  Each time, the MCSO staff transporting her unnecessarily restrained Ms. Doe by placing her in handcuffs, despite being well aware she was pregnant.

45.     During these trips to medical appointments and a court appearance between May 24, 2018 and July 10, 2018, Ms. Doe never struggled, resisted, or acted in any way that would cause MCSO or MCDOC staff to believe that she was a risk of harm to herself or to others, or that she was a flight risk.

**B.     Defendants Restrain Ms. Doe After She Goes into Labor.**

46.     During the day on July 11, 2018, Defendants John Joe #2 and Jane Joe #1 transported Ms. Doe to the Women's Ambulatory Care Services clinic at St. Peter's.  Though she was past her expected delivery date of July 7 and heavily pregnant, Ms. Doe was handcuffed with her hands in front of her during transport to and from the appointment.  As a result of this appointment, Ms. Doe was scheduled for an induction of labor on the hospital's labor and delivery

floor on July 14, 2018 at 8:00 a.m.  Defendants John Joe #2 and Jane Joe #1 transported Ms. Doe

back to the Middlesex County Jail, where she arrived at approximately 3:00 p.m.

47.     At approximately 9:00 p.m. on the night of July 11, 2018, Ms. Doe's water broke

in the Middlesex County Jail.

48.     Defendants Jimenez, Knight, and Marcinko were on duty at the jail at the time that

Ms. Doe's water broke.

49.     The Middlesex County Jail's lockdown procedure happened at 8:55 p.m.  Inmates

could freely use the telephone prior to lockdown.

50.     Ms. Doe alerted MCDOC staff that her water had broken. Corrections officers and

medical staff entered Ms. Doe's unit at the Middlesex County Jail and escorted Ms. Doe to the

jail's medical unit in a wheelchair.

51.     Although her sweatpants were noticeably saturated with a large volume of amniotic

fluid, and she had earlier that very day visited the women's clinic at St. Peter's because she was

past her due date, jail medical personnel did not believe Ms. Doe was in labor, and insisted on

using a test strip to confirm that the fluid was amniotic fluid before calling an ambulance to take

Ms. Doe to the hospital. The test strip indicated that the fluid was in fact amniotic fluid.

52.     Ms. Doe repeatedly asked MCDOC staff to allow her to call her family, including

Richard Roe who is her fiancé and her baby's father, so that she could inform them that the baby

was coming and request their presence at the hospital.  Ms. Doe also asked that MCDOC staff

make the call themselves, if they would not allow her to use the phone directly.

53.     Although Ms. Doe's labor began just minutes after lockdown, MCDOC staff

refused to permit her to call her family, and also refused to do so themselves.  As a result, no one

in Ms. Doe's family knew that her water had broken or that she was to be taken to the hospital.

54.     One member of the MCDOC staff told Ms. Doe that she would be permitted to make a single phone call when she arrived at the hospital.

55.     Upon information and belief, Defendant Knight supervised, directed, approved of, and/or failed to intervene in MCDOC staff's refusal to allow Ms. Doe to notify her family, including her partner Richard Roe.

**C.      Defendants Jimenez and Marcinko Transport Jane Doe to St. Peter's University Hospital in Handcuffs and Shackle Her to a Hospital Bed.**

56.     MCDOC staff assembled a "transport team" consisting of Defendants Jimenez and Marcinko to accompany Ms. Doe to the hospital after her water broke on the night of July 11, 2018.

57.     Defendant Jimenez placed Ms. Doe in handcuffs.

58.     Upon information and belief, Defendant Knight supervised, directed, approved of, and/or failed to intervene in the transport team's handcuffing of Ms. Doe after her water had broken.

59.     After North Brunswick EMS arrived at the Middlesex County Jail at approximately 9:30 p.m., Defendants Jimenez and Marcinko secured the handcuffed Ms. Doe in the ambulance.

60.     The ambulance departed at approximately 9:37 p.m., with Ms. Doe and Defendant Jimenez inside.  Ms. Doe experienced contractions in the ambulance, with her hands handcuffed in front of her. She was in pain.

61.     Defendant Marcinko followed the ambulance to Saint Peter's University Hospital in an MCDOC vehicle.

62.     After the ambulance arrived at the hospital at approximately 10:00 p.m., Defendants Jimenez and Marcinko took the handcuffed Ms. Doe into the emergency room, where hospital staff admitted her.

63.     Defendants Jimenez and Marcinko then accompanied the handcuffed Ms. Doe to a labor and delivery room.

64.     After being allowed use of her hands to change into a hospital gown and use the bathroom in the labor and delivery room, Ms. Doe got into the hospital bed.  Defendants Jimenez and Marcinko immediately shackled her right ankle to the bedrail.

65.     At the time Defendants Jimenez and Marcinko shackled Ms. Doe's ankle to the hospital bed, she was in labor and experiencing painful contractions.

66.     Defendants Jimenez and Marcinko left only approximately six inches of slack in the restraint, trapping Ms. Doe on her back and preventing her from fully turning to her side or otherwise easily changing positions to manage the extreme pain of labor.

67.     The shackle on Ms. Doe's ankle was extremely tight, causing her pain.

68.     At no time before or after Defendants Jimenez and Marcinko shackled Ms. Doe's ankle to the hospital bed did Ms. Doe ever struggle, resist, or act in any way that would cause them to believe that she was a risk of harm to herself or to others, or that she was a flight risk.

69.     Shortly after Defendants Jimenez and Marcinko shackled Ms. Doe's ankle to the hospital bed, a nurse who was tending to Ms. Doe asked them, "Is this really necessary?" Defendants Jimenez responded that they were only following "protocol."

70.     At several points during her labor, medical personnel entered Ms. Doe's labor and delivery room to provide medical care and conduct examinations, including checking Ms. Doe's cervical dilation.  Each time, Ms. Doe requested that Defendants Jimenez and Marcinko leave the room, but each time they refused, stating that they were required by "protocol" to "keep eyes" on her at all times.

71.     During examinations, medical personnel drew a curtain for Ms. Doe's privacy. Rather than exit the room, Defendant Marcinko insisted on remaining in the labor and delivery room on the far side of the curtain, while Defendant Jimenez insisted on remaining at Ms. Doe's side during the entire examination, citing "protocol."  Ms. Doe was humiliated by their presence, which compounded the already difficult and painful experience of going through labor.

72.     When a female doctor came in to conduct a vaginal exam, that doctor asked Defendants Jimenez and Marcinko, "Is this necessary?," referring to the ankle restraint.  Defendant Jimenez responded, "Yes.  It's protocol."

73.     The refusal by Defendants Jimenez and Marcinko to remove Ms. Doe's restraints, even after the doctor's request, compromised the doctor's ability to conduct the examination, because Ms. Doe could not properly raise and bend her legs.

74.     During Defendants Jimenez and Marcinko's supervision of Ms. Doe in her hospital room, Ms. Doe continued to ask them to either notify or permit her to notify her family that she had gone into labor.  Defendant Jimenez responded, "Not on my watch."

**D.     Defendants Padilla and Bocknack Replace Defendants Jimenez and Marcinko and Continue to Shackle Plaintiff During Labor.**

75.     At or around 2:00 a.m. on July 12, Defendants Padilla and Bocknack, members of the MCSO, arrived at the hospital to relieve Defendants Jimenez and Marcinko.

76.     Defendants Padilla, Bocknack, Jimenez, and Marcinko had a discussion in the hallway outside the open door to Ms. Doe's room.

77.     Defendants Jimenez and Marcinko then departed, leaving Ms. Doe in the custody of the MCSO and guarded by Defendants Padilla and Bocknack.

78.     Defendants Padilla and Bocknack continued to supervise Ms. Doe until approximately 7:00 a.m.

79.    After Defendants Padilla and Bocknack came on duty, Ms. Doe continued to experience contractions and the pain of labor.  Defendants Padilla and Bocknack refused to remove Ms. Doe's ankle shackle despite her repeated requests that they do so.

80.    Ms. Doe also repeatedly asked Defendants Padilla and Bocknack to allow her to contact her family to advise them that her water had broken and that Baby Doe would soon be born.  Defendants Padilla and Bocknack refused to allow Ms. Doe to make a call and also refused to notify her family themselves.

81.    At approximately 3:00 a.m., medical personal inserted a Foley catheter balloon through Ms. Doe's vagina and into her cervix and inflated it with saline, to promote cervical dilation with the intent of advancing Ms. Doe's labor, which was not adequately progressing. Defendants Padilla and Bocknack refused to remove Ms. Doe's ankle shackle during this procedure.

82.    After insertion of the Foley balloon, Ms. Doe's pain grew too much to bear and she requested an epidural.

83.    Nurses asked Defendants Bocknack and Padilla to remove the ankle shackle so that Ms. Doe could receive the epidural, a procedure that involves injections into the lower back.  Once again, they refused, stating the "protocol" prohibited them from removing the restraint at all.

84.    After nurses explained that it would be impossible to administer the epidural unless the shackle were removed, Defendants Bocknack and Padilla finally agreed to briefly remove it so that an anesthesiologist could perform the procedure.  Defendants Bocknack and Padilla's delay in removing the restraint postponed Ms. Doe's ability to receive the epidural, unnecessarily extending her pain.

85.     After receiving the epidural, Ms. Doe lost the ability to use her legs effectively or safely walk, rendering it physically impossible for her to escape. Nonetheless, Defendants Bocknack and Padilla immediately replaced the ankle restraint.

86.     Upon information and belief, at some point in approximately the first two hours after Defendants Bocknack and Padilla arrived in Ms. Doe's hospital room, Defendants Bocknack and Padilla placed a call to their supervisor, Defendant Mata.

87.     Upon information and belief, Defendant Mata ordered Defendants Bocknack and Padilla to keep Ms. Doe in restraints at all times, and ordered them not to permit Ms. Doe to contact anyone, including her fiancé Mr. Roe, to inform them that she was in labor.

88.     At some point in the early morning hours of July 12, 2018, Defendant Mata visited St. Peter's University Hospital in person.  Despite seeing Ms. Doe in distress, Defendant Mata refused to remove, or allow Defendants Bocknack and Padilla to remove, the ankle restraint that was shackling Ms. Doe to her hospital bed.

89.     Defendants Mata, Bocknack, and Padilla were present in the room when a doctor arrived to conduct a sterile vaginal exam of Ms. Doe.  Ms. Doe was extremely upset at the idea of the three defendants, particularly Defendants Mata and Padilla, who are men, observing her vaginal exam, telling them "This is very uncomfortable, you're males, why are you even in the room?"

90.     In response, Defendants Mata and Padilla refused to leave Ms. Doe's room, and in fact remained close to her bed during the vaginal exam, separated from her by only a thin curtain. Ms. Doe was distressed and humiliated by this.

91.     At no time during Defendant Padilla or Bocknack's supervision of Ms. Doe, did Ms. Doe ever struggle, resist, or act in any way that would cause them or Defendant Mata to believe that she was a risk of harm to herself or to others, or that she was a flight risk.

**E.     Defendants Rivera and Johnson Shackle Plaintiff During Labor and Up to the Delivery of Her Infant Son.**

92.     At or around 7:00 a.m. on July 12, 2018, Defendants Padilla and Bocknack were replaced by Defendants Rivera and Johnson, also employees of the MCSO.

93.     Defendants Rivera and Johnson supervised Plaintiff at St. Peter's University Hospital until approximately 3:00 p.m. on July 12, 2018.

94.     At no time during Defendant Rivera's or Johnson's supervision of Ms. Doe did Ms. Doe ever struggle, resist, or act in any way that would cause them to believe that she was a risk of harm to herself or to others, or that she was a flight risk.

95.     Shortly after Defendants Rivera and Johnson arrived in her hospital room, Ms. Doe begged them to remove her ankle restraint. She also repeated her plea that the someone contact Richard Roe so that he could learn that she was in labor and about to deliver their child.

96.     Defendants Rivera and Johnson refused to remove the shackles, or to let Ms. Doe call her mother or fiancé to inform them that she was in labor.

97.     Ms. Doe stated to them, in sum and substance, "I don't know why I am still in restraints. Can you take this off?" After her repeated requests, they responded, "There is nothing we can do. This is protocol."

98.     During the time that Defendants Rivera and Johnson were assigned to guard Ms. Doe, medical personnel at St. Peter's recognized the presence of labor complications that were causing fetal distress, including variable decelerations in Baby Doe's heart rate.

99.     These complications required medical interventions, including the placement of an intrauterine pressure catheter to internally monitor amniotic pressure during Ms. Doe's contractions, the administration of medication to space out Ms. Doe's contractions, an amnioinfusion to cushion Baby Doe during labor, and, ultimately, the placement of a fetal scalp monitor when it became difficult for St. Peter's medical staff to assess Baby Doe's fetal baseline heart rate.  Defendants Rivera and Johnson refused to remove Ms. Doe's ankle shackle during these interventions.

100.    Shortly before 10:00 a.m., Baby Doe continued to be in distress, to the point that St. Peter's medical personnel determined that it was necessary to immediately deliver Baby Doe by Caesarian section ("C-section").

101.    Defendants Rivera and Johnson accompanied Ms. Doe as medical personnel wheeled her hospital bed from the labor and delivery room through the halls toward the operating room.  Remarkably, Defendants Rivera and Johnson still did not remove her ankle restraint, providing an unnecessary impediment to Ms. Doe's emergency medical care and causing undue risks to her safety.

102.    When Ms. Doe's hospital bed arrived at the operating room, Defendant Johnson remained outside of the operating room, where he could observe the procedure through glass, while Defendant Rivera entered the operating room with Ms. Doe and medical personnel.

103.    Once Ms. Doe arrived in the operating room, she was transferred from the hospital bed to an operating table.

104.    Because Defendants Middlesex County, Cranston, Scott, Jimenez, Knight Marcinko, Bocknack, Padilla, Rivera, Johnson, and Mata had refused to permit, or failed to intervene to allow, Ms. Doe to call her fiancé or mother, she was forced to undergo a surgical

procedure, as well as the overwhelming experience of delivering her first child, without any family members there to support her and with the knowledge that her partner would miss his son's birth.

105.     Baby Doe was born at or around 10:16 a.m. on July 12, 2018, weighing 7 pounds, 7 ounces.

**F.     Defendants Rivera and Johnson Shackle Plaintiff Immediately After the Delivery of Her Infant Son, and Ms. Doe's Fiancé and Family Are Finally Notified of Her Hospitalization.**

106.     After the delivery, Defendants Rivera and Johnson accompanied Ms. Doe to a surgical recovery room and eventually to a postpartum recovery room.

107.     In both recovery rooms, on and off throughout this time period Ms. Doe's ankle and/or wrist remained shackled to the hospital bed.

108.     When medical personnel handed Ms. Doe her baby, in what should have been a purely joyous moment, Ms. Doe cried because she was alone, humiliated, and shackled to a bed.

109.     While in the postpartum recovery room, Ms. Doe was finally able to speak to her mother on the telephone, telling her "the baby was born."  Ms. Doe's mother rushed to the hospital immediately, frantic with worry and shocked that Ms. Doe had already delivered the baby, by herself.

110.     Ms. Doe was also able to speak to Richard Roe, the father of the newborn Baby Doe.  When Mr. Roe answered his phone, he asked Ms. Doe, "Did you just get to the hospital?" and Ms. Doe was forced to tell him, "No, I had [the baby]."

111.     Mr. Roe was out-of-state for work as a truck driver and was only able to get to the hospital in the evening on July 12, 2018, missing not only his child's birth, but also nearly the first twelve hours of his life.  Ms. Doe was separate from her fiancé in this momentous and singular experience for their family: welcoming their new child into the world.

112. Richard Roe had phoned the Middlesex County jail earlier in the day to inquire about Ms. Doe's whereabouts, concerned because he had not heard from her.

113. Richard Roe asked the person he spoke to at the jail whether Ms. Doe was still at the facility and was told, "Yes, she's still here." Had Richard Roe been told the truth—that Ms. Doe was in the hospital or even simply that she was no longer at the facility—he would have immediately re-arranged his work schedule so that he could go to the hospital as soon as possible to be there for Ms. Doe and meet his child.

114. While holding Baby Doe in one of the recovery rooms, Ms. Doe shifted to change into a more comfortable position. As she did so, the large, heavy metal ring of the shackle attached to her wrist unexpectedly swung and nearly hit Baby Doe in the head, narrowly avoiding injury to him.

115. Defendants Rivera and Johnson witnessed the wrist shackle almost hit Baby Doe's head.

116. Once again, Ms. Doe pleaded with Defendants Rivera and Johnson to remove her dehumanizing shackles, for the safety of her baby. Once again, they refused, citing protocol, though they agreed with Ms. Doe that it was inhumane.

117. Eventually, Defendants Rivera and Johnson called two supervisors: first an unknown sergeant, and then, upon information and belief, Defendant Neder.

118. On information and belief, Defendant Neder ordered Defendants Rivera and Johnson to continue shackling Ms. Doe, and instructed them to only remove Ms. Doe's wrist restraint while she was holding Baby Doe and/or Baby Doe was in the room with her.

119. Ms. Doe remained shackled to the bed, preventing her from tending to her infant son as quickly or as agilely as she would have liked.

120.    Defendants Rivera and Johnson continued to supervise Ms. Doe until approximately 3:00 p.m. on July 12, 2018, when they were relieved by a Defendant Eisenberg.

**G.    Defendants Einhorn, Eisenberg, Kophamel, Kolta, Caraballo, and Burch Continue to Shackle Ms. Doe During her Postpartum Recovery Stay at St. Peter's University Hospital.**

121.    For approximately 24 hours following her surgery, Ms. Doe was physically unable to get out of her bed as a result of the after effects of labor, her epidural, her C-section, and related anesthesia. At no point did she pose any risk of harm to herself or to others, and she certainly was not a flight risk.  The only discernible purpose for continuing to shackle Ms. Doe to the hospital bed was to dehumanize, humiliate, and endanger her.

122.    After Defendants Rivera and Johnson left Ms. Doe at approximately 3:00 p.m. on July 12, 2018, she was supervised by a rotating cast of MCSO sheriff's officers, beginning with Defendant Eisenberg, and also including Defendants Kophamel, Kolta, Caraballo, and Burch.  One of these Defendants would supervise her for an eight-hour shift and would then be relieved by another one of these Defendants, who would then guard Ms. Doe for another eight-hour shift.  This arrangement lasted until approximately the night of July 15, 2020, when Defendants Burch and Dominguez transported Ms. Doe back to the Middlesex County Jail.

123.    In the hospital room where Ms. Doe was recuperating from July 12, 2018 to July 15, 2018, each of Defendants Eisenberg, Kophamel, Kolta, Caraballo, and Burch unnecessarily restrained Ms. Doe by shackling her ankle and/or her wrist to her hospital bed on and off throughout this time period.

124.    Upon information and belief, Defendant Einhorn, who was on duty at the MCSO as shift commander during the afternoon and evening of July 12, 2020, had knowledge of and acquiesced in Defendant Eisenberg's restraint of Ms. Doe on that date.

125.     At no time during Defendants Eisenberg, Kophamel, Kolta, Caraballo, and Burch's periods of supervision of Ms. Doe did Ms. Doe ever struggle, resist, or act in any way that would cause them to believe that she was a risk of harm to herself or to others, or that she was a flight risk.

126.     Each of Defendants Eisenberg, Kophamel, Kolta, Caraballo, and Burch remained in Ms. Doe's recovery room with her through their respective shifts. Some read books or magazines, while others used their smartphones or worked on Sudoku puzzles.

127.     When Ms. Doe was finally able to get out of bed to use the bathroom, a period which began approximately 24 hours after her C-section, Defendants Eisenberg, Kophamel, Kolta, Caraballo, and Burch would remove Ms. Doe's restraint and demand that she leave the bathroom door open so that they could continue to observe her while she sat on the toilet.  When Ms. Doe was done using the bathroom and returned to bed, the Defendant staffing her room would immediately re-shackle her to the hospital bed.

128.     On the one occasion when Ms. Doe took a shower, the Defendant staffing her room at that time required that Ms. Doe allow the sheriff's officer to observe Ms. Doe while she was naked in the shower.

129.     During the time that Ms. Doe was recuperating from her C-section, St. Peter's medical staff advised her that it was important that she get out of bed and walk so that she could heal.  Defendants Eisenberg, Kophamel, Kolta, Caraballo, and Burch continued to shackle Ms. Doe to her bed, in direct contradiction of the medical advice Ms. Doe had received with regard to walking.  These Defendants further refused to let Ms. Doe walk in the hallway.

130.     Under the care and custody of Defendants Eisenberg, Kophamel, Kolta, Caraballo, and Burch, Ms. Doe was restrained even while she attempted to sleep on the nights of July 12-13,

July 13-14, and July 14-15, 2018.  During these nights, Ms. Doe was trapped on her back, unable to change sleeping positions.  She would find herself attempting to roll to her side, only to find that she was unable to because she was restrained.

**H.     Defendants Burch and Dominguez Transport Ms. Doe Back to the Middlesex County Jail Shackled By Her Wrists and Ankles.**

131.    St. Peter's University Hospital discharged Ms. Doe on July 15, 2018.  Ms. Doe's physician reviewed discharge paperwork with her during the morning hours of that day.

132.    At the direction of Defendant Eisenberg, Kophamel, Kolta, Caraballo, or Burch, who was assigned to guard Ms. Doe at the time, medical personnel then took Baby Doe away from Ms. Doe and took him to the nursery.  According to that defendant, "transport [wa]s on the way," so it was time for Ms. Doe to say goodbye to her son.

133.    Ms. Doe was traumatized by the separation from her baby.

134.    In fact, an MCSO transport team did not arrive for more than five hours after Ms. Doe was first separated from her baby.

135.    Desperate for more time with her son, Ms. Doe begged hospital staff and the Defendant sheriff who was supervising her at the time to bring Baby Doe back to her.  They eventually relented and Baby Doe was returned to Ms. Doe in her room for a few more hours.  Ms. Doe remained shackled to the bed at the time.

136.    At approximately 9:00 p.m. on July 15, 2018, Defendants Burch and Dominguez began the process of transporting Ms. Doe back to the Middlesex County Jail.

137.    Before Defendants Burch and Dominguez brought Ms. Doe out of the hospital, they ordered her to change into a green jail uniform.  Despite the fact that she had had major abdominal surgery only a few days before, Defendants Burch and Dominguez cuffed Ms. Doe with her hands behind her back and also cuffed her ankles.  When Ms. Doe questioned why she was being

restrained in this manner, Defendants Burch and Dominguez told her, "you're not pregnant anymore."

138.    Defendants Burch and Dominguez then placed her in the back of a County vehicle. Ms. Doe was in pain and feared for her safety, as she was unable to use her arms and hands to balance, brace, or otherwise protect herself and her incision during transport.

139.    Ms. Doe arrived back at the jail at approximately 10:10 p.m. on July 15, 2018.

140.    Ms. Doe was particularly frightened that she would fall and injure herself when she was forced to get out of Defendants Burch and Dominguez's vehicle in ankle restraints.  She slid out of the car without any assistance from Defendants Burch and Dominguez, who offered no help, and then walked, with difficulty, to the receiving and discharge area of the jail.

141.    After having her restraints removed in the receiving and discharge area of the Middlesex County Jail, Ms. Doe walked slowly down a long hallway back to her housing area, again with no offer of assistance.  She cried the entire way, physically and emotionally exhausted from her hospitalization, separation from her son, and her treatment at the hands of Defendants.

142.    On July 27, 2018, the judge presiding over Ms. Doe's case in drug court ordered that Ms. Doe be transported to a residential "Mommy & Me" program for women with children at Straight & Narrow, Inc. in Paterson, New Jersey on Monday, July 30, 2018.

143.    On July 30, 2018, Defendant Kophamel and Defendant John Joe #1, arrived at the Middlesex County Jail to transport Ms. Doe to the residential program.

144.    Defendants Kophamel and John Joe #1 restrained Ms. Doe, who was still recovering from her C-section, by the feet, hands, and waist; this was the first time Ms. Doe had ever been subject to waist restraints while in custody.  Ms. Doe was in pain and feared for her

25

safety, as she was unable to use her arms and hands to balance, brace, or otherwise protect herself and her incision during transport.

145.    Ms. Doe was reunited with Baby Doe in August 2018, when Straight & Narrow finally permitted him to enter the residential program with her.

146.    On information and belief, Ms. Doe's experience of being restrained throughout transports, labor, and post-partum is  part of the County's practice of shackling pregnant women incarcerated at the Middlesex County Jail.

147.    While Ms. Doe was held at the Middlesex County Jail in 2018, there were multiple other pregnant women incarcerated with her at the same time, several of whom gave birth while prisoners, including two who gave birth in between when Ms. Doe returned from St. Peter's on July 15, 2018 and when she was released from the jail on July 30, 2018.

148.    On information and belief, MCDOC and MCSO applied restraints to all pregnant prisoners who were confined at the same time as Ms. Doe.

**I.    Medical and Correctional Experts Unanimously Oppose Shackling Pregnant Women.**

149.    Medical experts, correctional experts, and maternal and fetal health experts unanimously agree that pregnant women should not be shackled absent the most extraordinary circumstances.  Such extraordinary circumstances are limited to situations in which a woman poses a risk of injury to herself or others that cannot be addressed by less restrictive means.

150.    Shackling poses a substantial risk of harm to a pregnant woman's health, and to the health and safety of the baby, at any stage of pregnancy.

151.    The American Medical Association, the Federal Bureau of Prisons, the U.S. Marshals Service, the American Correctional Association, the American College of Obstetricians and Gynecologists, and the American Public Health Association all prohibit and/or oppose shackling pregnant women during labor, delivery, and postpartum recovery.

152.    The American Medical Association issued a policy against shackling in 2010.  The AMA found that shackling increased the potential for harm to the woman and baby, that "freedom from physical restraints is especially critical during labor, delivery, and postpartum recovery," and that "restraints on a pregnant woman can interfere with the medical staff's ability to appropriately assist in childbirth or to conduct sudden emergency procedures."[3]

153.    The American College of Obstetricians opined in 2011 that the use of restraints on pregnant women compromises health care, is demeaning, and is rarely necessary.[4]

154.    The American Correctional Association has had in place policy guidelines on the use of restraints on pregnant women during transport, delivery, and the postpartum period since at least 2012.  As of 2017, and at all times relevant to this complaint, these policy guidelines cautioned that pregnant women "should be restrained in the least restrictive method possible" and recommended that use of restraints take into account, *inter alia*, custodial determinations about the inmate's risk of escape and the risk of immediate and serious harm posed by the inmate to herself and others.  The policy guidelines also explicitly state that "[l]eg restraints should be used only in extreme circumstances and never during labor and delivery."[5]

155.    Shackles interfere with healthcare providers' ability to conduct necessary tests to ensure the safe and healthy progression of a pregnancy.[6]

---

[3] AM. MED. ASS'N, AN "ACT TO PROHIBIT THE SHACKLING OF PREGNANT PRISONERS" MODEL STATE LEGISLATION 1 (2010).
[4] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, HEALTH CARE FOR PREGNANT AND POSTPARTUM INCARCERATED WOMEN AND ADOLESCENT FEMALES 3 (2011).
[5] AM. CORR. ASS'N, PUBLIC CORRECTIONAL POLICY ON USE OF RESTRAINTS WITH PREGNANT OFFENDERS 2012-1 (2017).
[6] Amanda Glenn, *Shackling Women During Labor: A Closer Look at the Inhumane Practice Still Occurring in Our Prisons*, 29 HASTINGS WOMEN'S L.J, 199, 202 (2018).

156.    Shackling can exacerbate a pregnant woman's already compromised balance while she is standing or walking, increasing the risk of falls that can injure not only the mother, but also the fetus.[7]

157.    The use of shackles on a pregnant woman in labor can inhibit successful cervical dilation, unnecessarily prolonging her labor.[8]

158.    Women often need to move around during labor, delivery, and recovery to manage pain and avoid complications, including moving their legs as part of the birthing process. Shackling limits a woman's ability to shift positions to manage the extreme pains of labor and childbirth.  This can, in turn, decrease the flow of oxygen to the fetus, endangering the health of both the mother and the unborn child.

159.    Shackling women during labor can lead to bruising from leg and abdomen restraints.  Leg restraints can also cause severe cuts on women's ankles because of the strains associated with childbirth.[9]

160.    When restraints are used during labor, doctors are limited in how they can manipulate the mother's body for the safety of the unborn child.

161.    During the final stages of labor, it is particularly important for the physician to act quickly to avoid potentially life-threatening emergencies for both the mother and the unborn child.

---

[7] ACLU Reproductive Freedom Project & ACLU National Prison Project, *ACLU Briefing Paper: The Shackling of Pregnant Women & Girls in U.S. Prisons, Jails & Youth Detention Centers* 3 (2012),  https://www.aclu.org/files/assets/anti-shackling_briefing_paper_stand_alone.pdf (hereafter, "ACLU Briefing Paper").

[8] *See* Glenn, *supra*, n.3.

[9] *ACLU Briefing Paper* at 3.

Shackles severely limit the ability of physician to provide such emergency care, threatening maternal and fetal health.[10]

162.    Using restraints after delivery may prevent mothers from effectively healing and breast-feeding.  It also puts new mothers at "substantial risk of thromboembolic disease and postpartum hemorrhage."[11]

163.    In addition to posing serious health risks to a mother and baby, shackling is almost never justified for security reasons.

164.    Among the states that have restricted the shackling of pregnant prisoners, none has documented instances of women in labor escaping or causing harm to themselves, the public, security guards, or medical staff.[12]

165.    Since New York City jails restricted the use of restraints on inmates admitted for delivery in 1990, there have been no reported incidents of escape or harm to medical staff.[13]

166.    Defendant Cranston was employed by the New York City Department of Correction ("NYC DOC") for approximately 25 years, between 1987 and 2014, reaching the position of First Deputy Commissioner by the time he left the NYC DOC in May 2014.

---

[10] AMNESTY INT'L, ABUSE OF WOMEN IN CUSTODY: SEXUAL MISCONDUCT AND THE SHACKLING OF PREGNANT WOMEN 23 (2001).

[11] UNIV. OF CHICAGO L. SCH. – INT'L HUMAN RIGHTS CLINIC, THE SHACKLING OF INCARCERATED PREGNANT WOMEN: A HUMAN RIGHTS VIOLATION COMMITTED REGULARLY IN THE UNITED STATES 6 (2014), https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1008&context=ihrc.

[12] *ACLU Briefing Paper* at 5.

[13] *Id.*

167.    Putting any restraints on pregnant prisoners has been prohibited at Rikers Island since 2009, including while Defendant Cranston worked there for many years before becoming Director of the MCDOC and Warden of the Middlesex County Jail.[14]

168.    In 2008, the Federal Bureau of Prisons mandated that restraints not be used on women during labor, delivery, or post-delivery recuperation absent compelling circumstances.[15]

169.    In 2011, the United States Department of Justice convened a task force to address the use of restraints on pregnant women in custody.  Its 2014 final report concluded that "[t]he use of restraints on pregnant women and girls under correctional custody should be limited to absolute necessity . . . when there is an imminent risk of escape or harm . . . and these risks cannot be managed by other reasonable means . . . ."[16]

170.    Given the myriad complications that can result from the shackling of pregnant women, the majority of states and the District of Columbia have adopted laws banning or severely limiting the use of any form of restraints on pregnant women.[17]

171.    New Jersey has explicitly prohibited the shackling of pregnant inmates of adult county correctional facilities since late 2017, when the New Jersey Department of Corrections proposed and later adopted new regulations for the use of restraints on pregnant inmates.  49 N.J.R. 2450(a) (Aug. 7, 2017) (proposing new regulations governing use of restraints at N.J.A.C. 10A:31-

---

[14] N.Y.C. Dep't of Corr., *Operations Order No. 05/09: Restraints for Pregnant Inmates and Inmates in Labor* (2009), *available at* https://on.nyc.gov/2BvRGoF.
[15] Fed. Bureau of Prisons, *Escorted Trips* §570.45(9)
[16] Nat'l Task Force on the Use of Restraints with Pregnant Women under Correctional Custody, Best Practices in the Use of Restraints with Pregnant Women and Girls Under Correctional Custody 6 (2014); *see also* United States Marshal Service, Policy 9.1 (Restraining Devices), § (D)(3)(e),(h).
[17] Ginnette G. Ferszt, Michelle Palmer, & Christine McGrane, *Commentary: Where Does Your State Stand on Shackling of Pregnant Incarcerated Women?*, 22 Nursing for Women's Health J. 17, 18 (2018).

9.3(g) and N.J.A.C. 10A:31-13.10(d)-(h)); 49 N.J.R. 3751(a) (Dec. 4, 2017) (effective date of new regulations). These regulations were derived from best practices issued in 2014 by the national task force, discussed *supra*, and Federal Bureau of Prisons policy on the subject.  49 N.J.R. 2450(a) (Aug. 7, 2017).

172.    New Jersey's regulations specifically prohibit the use of certain restraint practices, including leg and ankle restraints, during pregnancy and in the post-partum period unless "the inmate presents an immediate, serious threat of hurting herself, staff or others, or . . . presents an immediate credible risk of escape" that cannot be mitigated through other methods.  N.J.A.C. 10A:31-13.10(d)-(f).

173.    New Jersey's regulations prohibit the use of any restraints, including handcuffs, during labor and delivery.  *Id*.  They also require written standard operating procedures governing the use of restraints, N.J.A.C. 10A:31-13.10(g), and direct that medical personnel hold the power to approve and review the use of restraints on pregnant inmates, N.J.A.C. 10A:31-13.10(d), (f), and (h).

**J.    Compelling Evidence Supports the Importance of Access to Spouses During Labor and Delivery.**

174.    A significant body of research supports the conclusion that spouses[18] play a pivotal role in a woman's childbirth experience.  The benefit of spouses in the delivery room is firmly established; their participation enhances the future mothers' well-being and their own attachment to the child.  Mothers who have the support of a spouse during labor and delivery experience fewer childbirth complications and less postpartum depression.

---

[18] The word "spouse" is used to refer to the intimate partner of the woman giving birth, whether or not legally married.

175.    According to the American College of Obstetricians and Gynecologists, continuous one-to-one emotional support from a person such as a spouse is associated with improved outcomes for women in labor.  Benefits include a lower likelihood of cesarean birth, increased patient satisfaction, and a shorter duration of labor.[19]

176.    As one leading article stated: "Childbirth is a period characterized by stress and pain that is excruciating and described as the worst pain ever.  The spousal presence and involvement during childbirth have been reported to contribute positively in relation to pain relief, reduced analgesia use, the length of childbirth, and satisfactory birth experience."  Additionally, "spouses provide emotional support in the form of encouragement, praise, reassurance, listening, and a continuous physical presence which are key components of intra-partum care," and their "presence strengthens the bond and the relationship between the partners" and "promot[es] spousal responsibility during childbirth[.]"[20]

177.    A recent survey of clinical trials aimed at assessing the impact of the presence of a support person on women's labor outcomes that was led by a researcher at the World Health Organization concluded that: "One potential way to improve quality of care during childbirth in health facilities may be for women to be continuously supported by another person throughout labour."[21]  The survey further concluded that such support "may improve outcomes for women

---

[19] ACOG Committee Opinion No. 766, Approaches to Limit Intervention During Labor and Delivery (2019).

[20] A. U. Emelonye, T. Pitkäaho, A. Aregbesola, K. Vehviläinen-Julkunen, Spouses' Perspective of their Participation and Role in Childbirth Pain Relief. Ann Med Health Sci Res 6, 367-374 (2016).

[21] *Continuous support during childbirth may improve health outocmes for women and infants*, World Health Org., July 11, 2017, https://bit.ly/38Mom9p (discussing Meghan A. Bohren, *et al*., *Continuous support for women during childbirth*, Cochrane Database of Systematic Review 2017, Issue 7).

and infants, including increased spontaneous vaginal birth, shorter duration of labour, and decreased caesarean birth, instrumental vaginal birth, use of any analgesia, use of regional analgesia, low five-minute Apgar score and negative feelings about childbirth experiences."[22]

178.    The New Jersey Department of Health recently emphasized that a presence of a support person, such as a spouse, in the delivery room is so critical that it must be preserved even in the midst of global COVID-19 pandemic, during which other rights have been limited in service of the public health.  In a memorandum to licensed acute care hospitals, Commissioner Judith M. Persichilli wrote: "The Department of Health considers one support person essential to patient care throughout labor, delivery and the immediate postpartum period.  Therefore hospitals are required to allow one designated support[ person] to be with the expectant mother during these times[.]"[23]

179.    On May 15, 2020, New Jersey Governor Phil Murphy signed into law a bill codifying the Department of Health's directive, requiring all acute care general hospitals to "permit a pregnant woman to have at least one individual to accompany [her] during the period of labor and delivery in the room of the hospital where the woman gives birth to her child."  N.J.S.A. 26:2H-12.6h.  According to the statement of the legislative sponsor, "Research shows women with social support during childbirth tend to have shorter duration of labor, control their pain better, and have a reduced need for medical intervention. . . . In addition to providing physician and emotional comfort during labor and postpartum, support persons also reduce maternal mortality rates and alleviate the burden on hospitals by alerting staff when the patient is unable to do so."[24]

---

[22] Meghan A. Bohren, *et al*., *Continuous support for women during childbirth*, Cochrane.org, July 6, 2017, bit.ly/3fhcVce.
[23] Susan K. Livio, *N.J. allowing 1 delivery room visitor during childbirth amid coronavirus crisis*, NJ.com, Apr. 5, 2020, https://bit.ly/2ZWM6Ui (quoting Memorandum from Judith M. Persichilli, R.N., B.S.N., M.A., Commissioner to Acute Care Hospitals Licensed Pursuant to N.J.A.C. 8:43G, "One Support Person in Labor and Delivery Settings," Mar. 29, 2020, bit.ly/31Xm9qq).
[24] Livio, *supra* n.23.

180.     As a result of the foregoing, Ms. Doe suffered physical pain, discomfort, trauma, anxiety, severe emotional distress, and signs and symptoms of Posttraumatic Stress Disorder.  She has had both intrusive memories and nightmares about the circumstances of Baby Doe's birth, including about Baby Doe's health and safety and the experience of being alone and in danger.

**FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Excessive Force
(Against the Individual Officer Defendants)

181.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

182.     The Fourth Amendment to the Constitution of the United States protects individuals, including Plaintiff, from unreasonable seizures at the hands of law enforcement.  The reasonableness of an officer's actions is judged "under the totality of the circumstances," including whether the person restrained "poses an immediate threat to the safety of the officer or others" and whether she is actively attempting to flee.  *Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir. 2004).

183.     At all relevant times, there was no medical, legal, security, or other need to use restraints on Plaintiff.

184.     By restraining Plaintiff in the manner and under the circumstances set forth herein, by approving of such restraints, and/or by failing to intervene to prevent the use of such restraints over the course of Ms. Doe's transports from July 11 through July 30, 2018 and her hospitalization from July 11 through July 15, 2018, the Individual Officer Defendants used excessive force on Plaintiff in violation of the rights secured to her by the Fourth Amendment.

185.     As a direct and proximate result of the Individual Officer Defendants' misconduct detailed above, Plaintiff sustained the damages alleged herein.

## SECOND CAUSE OF ACTION

42 U.S.C. § 1983 – Eighth and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs
(Against the Individual Officer Defendants)

186.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

187.    The Eighth Amendment to the Constitution of the United States prohibits the infliction of cruel and unusual punishment.  That constitutional provision is violated when law enforcement officers act in a manner "deliberately indifferent to a prisoner's serious medical needs by 'intentionally denying or delaying access to medical care or interfering with the treatment once prescribed.'"  *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Estelle v. Gamble*, 428 U.S. 97, 97 (1976)).

188.    At all relevant times, Plaintiff's late-stage pregnancy, labor, delivery, and post-partum recovery created serious medical needs.

189.    By restraining Plaintiff in the manner and under the circumstances set forth herein, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of her transports from July 11 through July 30, 2018 and her hospitalization from July 11 through July 15, 2018, the Individual Officer Defendants placed Plaintiff and her unborn and then-infant child at serious risk for potentially life-threatening complications and were deliberately indifferent to Plaintiff's serious medical needs.

190.    As a direct and proximate result of the Individual Officer Defendants' misconduct detailed above, Plaintiff sustained the damages alleged herein.

**THIRD CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Substantive Due Process
(Against the Individual Officer Defendants)

191.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

192.    The Fourteenth Amendment protects against government deprivation of liberty without due process, and includes a substantive component.  The substantive component of the Due Process Clause is violated by conduct of government employees that shocks the conscience. *See, e.g.*, *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994).  "The exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances," and "[w]here a defendant has the luxury of proceeding in a deliberate fashion[,] deliberate indifference may be sufficient to shock the conscience." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 426 (3d Cir. 2006) (internal quotation marks, citations, and alteration omitted).

193.    By restraining Plaintiff in the manner and under the circumstances set forth herein, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of her transports from July 11 through July 30, 2018 and her hospitalization from July 11 through July 15, 2018, the Individual Officer Defendants engaged in outrageous and conscience-shocking conduct.

194.    As a direct and proximate result of the Individual Officer Defendants' misconduct detailed above, Plaintiff sustained the damages alleged herein.

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Excessive Force
(Against Defendant County)

195.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

196.     A municipality may be held liable under 42 U.S.C. § 1983 when a violation of a plaintiff's rights "was caused by the municipality's policy or custom," and "the policy or custom itself violates the Constitution or . . . the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotation marks omitted).

197.     For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from excessive force.

198.     In the course of shackling Plaintiff, some of the Individual Officer Defendants cited to a "policy" or "protocol" which they were following, including telling medical professionals that they were required to use restraints by this "policy," "procedure," or "protocol," as set forth in paragraphs 69, 70, 71, 72, 83, 97, and 116 above.

199.     These violations of Plaintiff's Fourth and Fourteenth Amendment constitutional rights, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendant Middlesex County, which has, with deliberate indifference, explicitly or tacitly approved the unconstitutional practice described above.  In maintaining this "policy" or "protocol" regarding the use of restraints on pregnant women, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

200.     Alternatively, the County failed to establish policies, practices, and procedures and/or failed to adequately train, supervise, and discipline the Individual Officer Defendants regarding the legal proscription against and well-known dangers of restraining pregnant women, women in labor, or women who have just given birth, and on the governing state regulations

prohibiting this conduct. By virtue of these failures, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

201. As a direct and proximate result of the County's misconduct detailed above, Plaintiff sustained the damages alleged herein.

### FIFTH CAUSE OF ACTION
42 U.S.C. § 1983 – Eighth and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs
(Against Defendant County)

202. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

203. A municipality may be held liable under 42 U.S.C. § 1983 when a violation of a plaintiff's rights "was caused by the municipality's policy or custom," and "the policy or custom itself violates the Constitution or . . . the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotation marks omitted).

204. For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under the Eighth and Fourteenth Amendments to the United States Constitution by acting with deliberate indifference to her serious medical needs.

205. In the course of shackling Plaintiff and thus acting with deliberate indifference to her medical needs, some of the Individual Officer Defendants cited to a "policy" or "protocol" which they were following, including telling medical professionals that they were required to use restraints by this "policy," "procedure," or "protocol," as set forth in paragraphs 69, 70, 71, 72, 83, 97, and 116 above.

206. These violations of Plaintiff's Eighth and Fourteenth Amendment constitutional rights, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and

proximately caused by the actions and/or inactions of Defendant Middlesex County, which has, with deliberate indifference, explicitly or tacitly approved the unconstitutional practice described above.

207.    Alternatively, the County failed to establish policies, practices, and procedures and/or failed to adequately train, supervise, and discipline the Individual Officer Defendants regarding the legal proscription against and well-known dangers of restraining pregnant women, women in labor, or women who have just given birth, and on the governing state regulations prohibiting this conduct. By virtue of these failures, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

208.    As a direct and proximate result of the County's misconduct detailed above, Plaintiff sustained the damages alleged herein.

### SIXTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Substantive Due Process
(Against Defendant County)

209.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

210.    A municipality may be held liable under 42 U.S.C. § 1983 when a violation of a plaintiff's rights "was caused by the municipality's policy or custom," and "the policy or custom itself violates the Constitution or . . . the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotation marks omitted).

211.    For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under the Fourteenth Amendment to the United States Constitution by engaging in conduct that shocks the conscience.

212.    In the course of shackling Plaintiff, some of the Individual Officer Defendants cited to a "policy" or "protocol" which they were following, including telling medical professionals that they were required to use restraints by this "policy," "procedure," or "protocol," as set forth in paragraphs 69, 70, 71, 72, 83, 97, and 116 above.

213.    These violations of Plaintiff's Fourteenth Amendment substantive due process rights, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendant Middlesex County, which has, with deliberate indifference, explicitly or tacitly approved the unconstitutional practice described above.  In maintaining this "policy" or "protocol" regarding the use of restraints on pregnant women, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

214.    Alternatively, the County failed to establish policies, practices, and procedures and/or failed to adequately train, supervise, and discipline the Individual Officer Defendants regarding the legal proscription against and well-known dangers of restraining pregnant women, women in labor, or women who have just given birth, and on the governing state regulations prohibiting this conduct. By virtue of these failures, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

215.    As a direct and proximate result of the County's misconduct detailed above, Plaintiff sustained the damages alleged herein.

### SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Excessive Force
(Against Defendant Cranston and Scott)

216.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

217.   Individual defendants who are policymakers may be liable under § 1983 for constitutional violations experienced by a plaintiff if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (internal quotation marks omitted).

218.   For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from excessive force while acting pursuant to policy, practices, or custom set forth by Defendants Cranston and Scott in their roles as final policymakers for the Defendant County on Middlesex County Jail and MCSO matters, respectively.

219.   These violations of Plaintiff's Fourth and Fourteenth Amendment constitutional rights, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendants Cranston and/or Scott, who, in establishing and maintaining these policies, practices, or customs, were deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.  At all relevant times, Defendants Cranston and Scott were aware that the use of restraints on pregnant women such as Ms. Doe without proper justification and medical approval was proscribed by state regulation.

220.   As a direct and proximate result of Defendant Cranston and Scott's misconduct detailed above, Plaintiff sustained the damages alleged herein.

**EIGHTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Eighth and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs
(Against Defendants Cranston and Scott)

221.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

222.    Individual defendants who are policymakers may be liable under § 1983 for constitutional violations experienced by a plaintiff if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (internal quotation marks omitted).

223.    For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under the Eighth and Fourteenth Amendments to the United States Constitution by acting with deliberate indifference to her serious medical needs pursuant to policy, practices, or custom set forth by Defendants Cranston and/or Scott in their roles as final policymakers for the Defendant County for Middlesex County Jail and MCSO matters, respectively.

224.    These violations of Plaintiff's Eighth and Fourteenth Amendment constitutional rights, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendants Cranston and Scott, who, in establishing and maintaining these policies, practices, or customs, were deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.  At all relevant times, Defendants Cranston and Scott were aware that the use of restraints on pregnant women such as Ms. Doe without proper justification and medical approval was proscribed by state regulation.

225.     As a direct and proximate result of Defendant Cranston and Scott's misconduct detailed above, Plaintiff sustained the damages alleged herein.

**NINTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Substantive Due Process
(Against Defendants Cranston and Scott)

226.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

227.     Individual defendants who are policymakers may be liable under § 1983 for constitutional violations experienced by a plaintiff if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (internal quotation marks omitted).

228.     For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's Fourteenth Amendment substantive due process rights by engaging in conduct that shocks the conscience pursuant to policy, practices, or custom set forth by Defendants Cranston and/or Scott in their roles as final policymakers for the Defendant County for Middlesex County Jail and MCSO matters, respectively.

229.     These violations of Plaintiff's Fourteenth Amendment constitutional rights, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendants Cranston and/or Scott, who, in establishing and maintaining these policies, practices, or customs, were deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically. At all relevant times, Defendants Cranston and Scott were aware that the use of restraints on pregnant women

such as Ms. Doe without proper justification and medical approval was proscribed by state regulation.

230.    As a direct and proximate result of Defendant Cranston and Scott's misconduct detailed above, Plaintiff sustained the damages alleged herein.

<u>**TENTH  CAUSE OF ACTION**</u>
42 U.S.C. § 1983 – Fourteenth Amendment
Substantive Due Process
(Against Defendants Jimenez, Knight, Marcinko, Bocknack, Johnson, Padilla, Rivera, and Mata)

231.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

232.    The Supreme Court has long recognized an individual's liberty interest in matters relating to marriage, procreation, contraception, family relationships, and child rearing and education.  *See Doe v. Delie*, 257 F3d 309, 317 (3d Cir. 2001).  The liberty interest in maintaining the integrity of the family unit, in "[c]hoices about marriage, family life, and the upbringing of children," is of fundamental importance among those "rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect."  *M.L.B. v. S.L.J.,* 519 U.S. 102, 116 (1996) (internal quotation marks and citation omitted).

233.    Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Plaintiff has a protected liberty interest in the maintenance and integrity of her family unit.  *See, e.g.*, *Croft v. Westmoreland Cty. Children and Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997).  The Due Process Clause of the Fourteenth Amendment also protects Plaintiff's fundamental right as a parent with regard to the care, custody, and control of her children.  *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000).

234.    Plaintiff's liberty interest in her family relationships protects her decision to form a family with Richard Roe by having a biological child together.  Joining together with another

44

person to have a child and create a family includes the ability to jointly bring that child into the world, with both parents present for and participating in the birth. Indeed, the shared experience of the birth of a child is one of the important and intimate moments in a family's existence, and in the relationship between that child's parents.

235.    Plaintiff's liberty interest also includes the right to make decisions about the care of her child, such as the decision that the child's father should participate in and be present at his birth. The right of a parent to make critical decisions about the upbringing of her child starts with deciding whether another parent will be present for the child's birth, an event which sets the stage for that parent's role in the child's life going forward.

236.    By denying Plaintiff the right to have Richard Roe, her child's father, know of, attend, or participate in the birth of their child, Defendants Jimenez, Knight, Marcinko, Bocknack, Johnson, Padilla, Rivera, and Mata deprived Plaintiff of and unjustifiably interfered with her familial relationships, including her protected interest in the maintenance and integrity of her family, and her right to make decisions about the care of her son, all in violation of the Due Process Clause of the Fourteenth Amendment.

237.    At all relevant times, Plaintiff was a non-violent offender and posed no danger or threat of escape to any person as she labored and underwent a C-section delivery of her son Baby Doe.

238.    Defendants Jimenez, Knight, Marcinko, Bocknack, Johnson, Padilla, Rivera, and Mata's conduct in refusing to allow Plaintiff to contact her child's father to alert him to the birth or have him present for the birth of their child was arbitrary, unduly restrictive, and not reasonably related to any legitimate penological objective.

239.    As a direct and proximate result of Defendants Jimenez, Knight, Marcinko, Bocknack, Johnson, Padilla, Rivera, and Mata's misconduct detailed above, Plaintiff sustained the damages alleged herein.

**ELEVENTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Substantive Due Process
(Against Defendant County)

240.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

241.    A municipality may be held liable under 42 U.S.C. § 1983 when a violation of a plaintiff's rights "was caused by the municipality's policy or custom," and "the policy or custom itself violates the Constitution or . . . the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotation marks omitted).

242.    For the reasons set forth above, Defendants Jimenez, Knight, Marcinko, Bocknack, Johnson, Padilla, Rivera, and Mata violated Plaintiff's Fourteenth Amendment substantive due process rights by denying Plaintiff the right to have Richard Roe, her child's father, know of, attend, or participate in the birth of their child.

243.    These violations of Plaintiff's Fourteenth Amendment substantive due process rights, Plaintiff's damages, and the conduct of Defendants Jimenez, Knight, Marcinko, Bocknack, Johnson, Padilla, Rivera, and Mata were directly and proximately caused by the actions and/or inactions of Defendant Middlesex County, which has, with deliberate indifference, explicitly or tacitly approved the unconstitutional practice described above.

244.    Alternatively, the County failed to establish policies, practices, and procedures and/or failed to adequately train, supervise, and discipline Defendants Jimenez, Knight, Marcinko,

Bocknack, Johnson, Padilla, Rivera, and Mata regarding the legal proscriptions against and well-known negative physical, mental, and emotional health consequences of denying a woman in labor the right to have her spouse and the child's father, know of, attend, or participate in the birth of their child. By virtue of these failures, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

245.    As a direct and proximate result of the County's misconduct detailed above, Plaintiff sustained the damages alleged herein.

**TWELFTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Substantive Due Process
(Against Defendants Cranston and Scott)

246.    Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

247.    Individual defendants who are policymakers may be liable under § 1983 for constitutional violations experienced by a plaintiff if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (internal quotation marks omitted).

248.    For the reasons set forth above, Defendants Jimenez, Knight, Marcinko, Bocknack, Johnson, Padilla, Rivera, and Mata have violated Plaintiff's Fourteenth Amendment substantive due process rights by denying Plaintiff the right to have Richard Roe, her child's father, know of, attend, or participate in the birth of their child pursuant to policy, practices, or custom set forth by Defendants Cranston and/or Scott in their roles as final policymakers for the Defendant County for Middlesex County Jail and MCSO matters, respectively.

249.     These violations of Plaintiff's Fourteenth Amendment constitutional rights, Plaintiff's damages, and the conduct of Defendants Jimenez, Knight, Marcinko, Bocknack, Johnson, Padilla, Rivera, and Mata were directly and proximately caused by the actions and/or inactions of Defendants Cranston and/or Scott, who, in establishing and maintaining these policies, practices, or customs, were deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.  At all relevant times, Defendants Cranston and Scott were aware that denying women in labor the right to have her spouse and the child's father, alerted to, attend, or participate in, the birth of their child was contrary to law.

250.     As a direct and proximate result of Defendant Cranston and Scott's misconduct detailed above, Plaintiff sustained the damages alleged herein.

### THIRTEENTH CAUSE OF ACTION
Violations of New Jersey Constitution, Article I, Paragraph 1
(Against the Individual Officer Defendants)

251.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

252.     Article I, Paragraph 1 of the New Jersey Constitution guarantees to "all persons . . . certain natural an unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  Under Article I, Paragraph 1, county correctional inmates have a substantive due process right to be free from governmental abuses that shock the conscience or are offensive to human dignity.

253.     By restraining Plaintiff in the manner and under the circumstances set forth herein, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of Ms. Doe's transports from July 11 through July 30, 2018 and her hospitalization from

July 11 through July 15, 2018, the Individual Officer Defendants engaged in conduct that shocks the conscience and is offensive to human dignity.

254.    As a direct and proximate result of the Individual Officer Defendants' misconduct detailed above, Plaintiff sustained the damages alleged herein.

## FOURTEENTH CAUSE OF ACTION
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 1
(Against the Individual Officer Defendants)

255.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

256.    For the reasons set forth above in the Thirteenth Cause of Action, the Individual Officer Defendants' conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

## FIFTEENTH CAUSE OF ACTION
Violation of New Jersey Constitution, Article I, Paragraph 7
(Against the Individual Officer Defendants)

257.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

258.    Article I, Paragraph 7 of the New Jersey Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  Under Article I, Paragraph 7, county correctional inmates have a constitutional right to be free from the use of excessive force.

259.    By restraining Plaintiff in the manner and under the circumstances set forth herein, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of Ms. Doe's transports from July 11 through July 30, 2018 and her hospitalization from July 11 through July 15, 2018, the Individual Officer Defendants used excessive and unconscionable force on Plaintiff.

260.     As a direct and proximate result of the Individual Officer Defendants' misconduct detailed above, Plaintiff sustained the damages alleged herein.

### SIXTEENTH CAUSE OF ACTION
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 7
(Against the Individual Officer Defendants)

261.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

262.     For the reasons set forth above in the Fifteenth Cause of Action, the Individual Officer Defendants' conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

### SEVENTEENTH CAUSE OF ACTION
Violation of New Jersey Constitution, Article I, Paragraph 12
(Against the Individual Officer Defendants)

263.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

264.     Article I, Paragraph 12 of the New Jersey Constitution prohibits the infliction of "cruel and unusual punishments[.]"  Under Article I, Paragraph 12, county correctional inmates have a constitutional right to safe and humane conditions of confinement and to adequate medical care for serious medical needs.

265.     By restraining Plaintiff in the manner and under the circumstances set forth herein, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of her transports from July 11 through July 30, 2018 and her hospitalization from July 11 through July 15, 2018, the Individual Officer Defendants (1) subjected Plaintiff to dangerous and inhumane conditions of confinement; (2) placed Plaintiff and her unborn and then-infant child at serious risk for potentially life-threatening complications; and (3) were deliberately indifferent to Plaintiff's serious medical needs.

266.    As a direct and proximate result of the Individual Officer Defendants' misconduct detailed above, Plaintiff sustained the damages alleged herein.

## EIGHTEENTH CAUSE OF ACTION
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 12
(Against the Individual Officer Defendants)

267.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

268.    For the reasons set forth above in the Seventeenth Cause of Action, the Individual Officer Defendants' conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

## NINETEENTH CAUSE OF ACTION
Violation of New Jersey Constitution, Article I, Paragraph 1
(Against the Defendant County)

269.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

270.    For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under Article I, Paragraph 1 of the New Jersey Constitution by engaging in conduct that shocks the conscience and is offensive to human dignity.

271.    In the course of shackling Plaintiff, some of the Individual Officer Defendants cited to a "policy" or "protocol" which they were following, including telling medical professionals that they were required to use restraints by this "policy," "procedure," or "protocol," as set forth in paragraphs 69, 70, 71, 72, 83, 97, and 116 above.

272.    These violations of Plaintiff's rights under Article I, Paragraph 1 of the New Jersey Constitution, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendant Middlesex County, which has, with deliberate indifference, explicitly or tacitly approved the unconstitutional practice

described above.  In maintaining this "policy" or "protocol" regarding the use of restraints on pregnant women, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

273.    Alternatively, the County failed to establish policies, practices, and procedures and/or failed to adequately train, supervise, and discipline the Individual Officer Defendants regarding the legal proscription against and well-known dangers of restraining pregnant women, women in labor, or women who have just given birth, and on the governing state regulations prohibiting this conduct. By virtue of these failures, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

274.    As a direct and proximate result of the County's misconduct detailed above, Plaintiff sustained the damages alleged herein.

## TWENTIETH CAUSE OF ACTION
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 1
(Against Defendant County)

275.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

276.    For the reasons set forth above in the Nineteenth Cause of Action Middlesex County's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

## TWENTY-FIRST CAUSE OF ACTION
Violation of New Jersey Constitution, Article I, Paragraph 7
(Against the Defendant County)

277.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

278.     For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under Article I, Paragraph 7 of the New Jersey Constitution by using excessive and unconscionable force on Plaintiff.

279.     In the course of shackling Plaintiff, some of the Individual Officer Defendants cited to a "policy" or "protocol" which they were following, including telling medical professionals that they were required to use restraints by this "policy," "procedure," or "protocol," as set forth in paragraphs 69, 70, 71, 72, 83, 97, and 116.

280.     These violations of Plaintiff's rights under Article I, Paragraph 7 of the New Jersey Constitution, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendant Middlesex County, which has, with deliberate indifference, explicitly or tacitly approved the unconstitutional practice described above.  In maintaining this "policy" or "protocol" regarding the use of restraints on pregnant women, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

281.     Alternatively, the County failed to establish policies, practices, and procedures and/or failed to adequately train, supervise, and discipline the Individual Officer Defendants regarding the legal proscription against and well-known dangers of restraining pregnant women, women in labor, or women who have just given birth, and on the governing state regulations prohibiting this conduct. By virtue of these failures, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

282.     As a direct and proximate result of the County's misconduct detailed above, Plaintiff sustained the damages alleged herein.

**TWENTY-SECOND CAUSE OF ACTION**
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 7
(Against the Defendant County)

283.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

284.     For the reasons set forth above in the Twenty-First Cause of Action, Middlesex County's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

**TWENTY-THIRD CAUSE OF ACTION**
Violation of New Jersey Constitution, Article I, Paragraph 12
(Against the Defendant County)

285.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

286.     For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under Article I, Paragraph 12 of the New Jersey Constitution (1) by subjecting her to dangerous and inhumane conditions of confinement; (2) by placing her and her unborn and then-infant child at serious risk for potentially life-threatening complications; and (3) acting with deliberate indifference to Plaintiff's serious medical needs.

287.     In the course of shackling Plaintiff, some of the Individual Officer Defendants cited to a "policy" or "protocol" which they were following, including telling medical professionals that they were required to use restraints by this "policy," "procedure," or "protocol," as set forth in paragraphs 69, 70, 71, 72, 83, 97, and 116 above.

288.     These violations of Plaintiff's rights under Article I, Paragraph 12 of the New Jersey Constitution, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendant Middlesex County, which has, with deliberate indifference, explicitly or tacitly approved the unconstitutional

practice described above.  In maintaining this "policy" or "protocol" regarding the use of restraints on pregnant women, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

289.    Alternatively, the County failed to establish policies, practices, and procedures and/or failed to adequately train, supervise, and discipline the Individual Officer Defendants regarding the legal proscription against and well-known dangers of restraining pregnant women, women in labor, or women who have just given birth, and on the governing state regulations prohibiting this conduct. By virtue of these failures, the County was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

290.    As a direct and proximate result of the County's misconduct detailed above, Plaintiff sustained the damages alleged herein.

### TWENTY-FOURTH CAUSE OF ACTION
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 12
(Against Defendant County)

291.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

292.    For the reasons set forth above in the Twenty-Third Cause of Action, Middlesex County's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

### TWENTY-FIFTH CAUSE OF ACTION
Violation of New Jersey Constitution, Article I, Paragraph 1
(Against Defendants Cranston and Scott)

293.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

294.    For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under Article I, Paragraph 1 of the New Jersey Constitution by engaging in conduct that shocks the conscience and is offensive to human dignity.

295.    These violations of Plaintiff's rights under Article I, Paragraph 1 of the New Jersey Constitution, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendants Cranston and/or Scott, who, in establishing and maintaining these policies, practices, or customs, were deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.  At all relevant times, Defendants Cranston and Scott were aware that the use of restraints on pregnant women such as Ms. Doe without proper justification and medical approval was proscribed by state regulation.

296.    As a direct and proximate result of Defendants Cranston and Scott's misconduct detailed above, Plaintiff sustained the damages alleged herein.

### TWENTY-SIXTH CAUSE OF ACTION
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 1
(Against Defendants Cranston and Scott)

297.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

298.    For the reasons set forth above in the Twenty-Fifth Cause of Action, Defendants Cranston and Scott's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

### TWENTY-SEVENTH CAUSE OF ACTION
Violation of New Jersey Constitution, Article I, Paragraph 7
(Against Defendants Cranston and Scott)

299.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

300.    For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under Article I, Paragraph 7 of the New Jersey Constitution by using excessive and unconscionable force on Plaintiff.

301.    These violations of Plaintiff's rights under Article I, Paragraph 7 of the New Jersey Constitution, Plaintiff's damages, and the conduct of the Individual Officer Defendants were directly and proximately caused by the actions and/or inactions of Defendants Cranston and/or Scott, who, in establishing and maintaining these policies, practices, or customs, were deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.  At all relevant times, Defendants Cranston and Scott were aware that the use of restraints on pregnant women such as Ms. Doe without proper justification and medical approval was proscribed by state regulation.

302.    As a direct and proximate result of Defendants Cranston and Scott's misconduct detailed above, Plaintiff sustained the damages alleged herein.

### TWENTY-EIGHT CAUSE OF ACTION
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 7
(Against Defendants Cranston and Scott)

303.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein. Twenty-second

304.    For the reasons set forth above in the Twenty-Seventh Cause of Action, Defendant Cranston and Scott's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

### TWENTY-NINTH CAUSE OF ACTION
Violation of New Jersey Constitution, Article I, Paragraph 12
(Against Defendants Cranston and Scott)

305.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth herein.

306.    For the reasons set forth above, the Individual Officer Defendants have violated Plaintiff's right under Article I, Paragraph 12 of the New Jersey Constitution (1) by subjecting her to dangerous and inhumane conditions of confinement; (2) by placing her and her unborn and then-infant child at serious risk for potentially life-threatening complications; and (3) acting with deliberate indifference to Plaintiff's serious medical needs.

307.    These violations of Plaintiff's rights under Article I, Paragraph 12 of the New Jersey Constitution, Plaintiff's damages, and the conduct of the individual defendants were directly and proximately caused by the actions and/or inactions of Defendants Cranston and/or Scott, who, in establishing and maintaining these policies, practices, or customs, were deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.  At all relevant times, Defendants Cranston and Scott were aware that the use of restraints on pregnant women such as Ms. Doe without proper justification and medical approval was proscribed by state regulation.

308.    As a direct and proximate result of Defendants Cranston and Scott's misconduct detailed above, Plaintiff sustained the damages alleged herein

### THIRTIETH CAUSE OF ACTION
N.J.S.A 10:6-2 – New Jersey Constitution, Article I, Paragraph 12
(Against Defendants Cranston and Scott)

309.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

310.    For the reasons set forth above in the Twenty-Ninth Cause of Action, Defendant Cranston and Scott's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.  Compensatory damages against all Defendants in an amount to be determined at trial;

b.  Punitive damages against the Individual Officer Defendants in an amount to be determined at trial;

c.  A declaration that Middlesex County's policy or custom of restraining pregnant incarcerated persons during transportation, labor, delivery, or recovery violates the United States Constitution and the New Jersey Constitution;

d.  Reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and N.J.S.A. 10:6-2; and

e.  Such other and further relief as this Court may deem just and proper.

## TRIAL BY JURY DEMANDED

Plaintiff Jane Doe demands a trial by jury on all matters so triable.

Dated: July 10, 2020

**EMERY CELLI BRINCKERHOFF & ABADY LLP**

Katherine Rosenfeld*
Andrew K. Jondahl*
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000
krosenfeld@ecbalaw.com
ajondhal@ecbalaw.com

*Motions for pro hac vice admission forthcoming*

Respectfully submitted,

**GIBBONS P.C**

By: s/   Lawrence S. Lustberg
Lawrence S. Lustberg, Esq.
Jessica L. Hunter, Esq.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
llustberg@gibbonslaw.com
jhunter@gibbonslaw.com

*Attorneys for Plaintiff Jane Doe*

59